IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JA'WAYNE HELFFERICH,

        Plaintiff,

vs.                                  No. CIV 09-459 WJ/LFG

MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

Plaintiff  Ja'Wayne Helfferich ("Helfferich") invokes this Court's jurisdiction under 42

U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner").  The Commissioner determined that Helfferich was not eligible for disability

insurance benefits ("DIB") nor for supplemental security income benefits ("SSI").  Helfferich moves

this Court for an order reversing the Commissioner's final decision and/or remanding for a

rehearing.

### Background

Helfferich was born on July 6, 1969 and was 38 years old at the time of the administrative

hearing in November 2007.  [Tr. 58].  His highest educational level is two semesters of college

work.  [Tr. 117; 565-570].  He was previously employed as a construction worker, handyman and

---

[1]Within fourteen (14) days after a party is served with a copy of the legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations.  A party must file any objections within the 14-day period allowed if that party wants to have appellate review of the analysis and recommendations.  If no objections are filed, no appellate review will be allowed.

truck driver. [Tr. 85-86, 136-143; 519-521].

Helfferich claims disability based on chronic pain from a broken leg and residual effects, including headaches and fatigue, from interferon treatment for Hepatitis C. [Tr. 74; Doc. 18, at 1-2]. He applied for DIB and SSI on October 7, 2005, alleging an onset date of September 29, 2004. [Tr. 13, 58-62, 132, 519]. His applications were denied at the initial and reconsideration stages, and he sought review by an Administrative Law Judge ("ALJ"). [Tr. 42-43, 45-51, 441-443]. An administrative hearing was held before ALJ George Reyes on November 6, 2007. [Tr. 515].

In a written decision dated August 8, 2008, the ALJ found that Helfferich was not disabled within the meaning of the Social Security Act and denied his applications for both DIB and SSI. [Tr. 13-23]. Helfferich challenged this determination to the Appeals Council. [Tr. 9]. The Council denied his request for review on March 13, 2009 after considering new and additional evidence. [Tr. 3-6]. This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant throughout the first four steps of this process to prove disability, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five. If at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in

---

[2] 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2010); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3] 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f)(2010); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that

it "significantly limits [his] physical or mental ability to do basic work activities . . . .;"[5] at step three,

the Commissioner must conclude the claimant is disabled if he proves that these impairments meet

or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

1 (2006);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the

physical and mental demands of his past relevant work.[7]

      If the claimant is successful at all four of the preceding steps, the burden shifts to the

Commissioner to prove, at step five, that considering claimant's residual functional capacity

("RFC"),[8] age, education and past work experience, he is capable of performing other work that

exists in the national economy.[9]  If the Commissioner proves other work exists which the claimant

can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10]

      In the case at bar, the ALJ made the dispositive determination of non-disability at step five

of the sequential evaluation.  Helfferich contends that the final administrative decision is not

supported by substantial evidence, that the Commissioner did not carry the burden of proof, and that

---

[4]20 C.F.R. §§ 404.1520(b), 416.920(b)(2010).

[5]20 C.F.R. §§ 404.1520(c), 416.920(c)(2010).

[6]20 C.F.R. §§ 404.1520(d), 416.920(d) (2010).  If a claimant's impairment meets certain criteria, that means his impairments are "severe enough to prevent [him] from doing any gainful activity." 20 C.F.R. §§ 404.1525(a), 416.925(a) (2010).

[7]20 C.F.R. §§ 404.1520(e),(f) 416.920(e),(f) (2010).

[8]The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are:  sedentary, light, medium, heavy and very heavy.  20 C.F.R. §§ 404.1567, 416.967 (2010).

[9]20 C.F.R. §§ 404.1520(g), 416.920(g) (2010).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

the Commissioner did not apply the correct legal standards.

## Standard of Review and Allegations of Error

On appeal, the Court's review of the Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to consider whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992).

In Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996), the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.  (citations omitted).

If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court can neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In this case, the ALJ found that  that Helfferich could no longer perform his past relevant work but was capable of performing light work with certain limitations, and that the following jobs existed in that category which Helfferich could perform: cashier, receptionist/information clerk, and bank teller. [Tr. 20-22].

Helfferich claims the ALJ erred in the following ways: (1) The ALJ's RFC assessment is

unsupported by substantial evidence in that the ALJ failed to give controlling weight to the opinion of Helfferich's treating physician; and (2) The ALJ's step-five determination was unsupported by substantial evidence in that the ALJ presented a hypothetical to the VE which did not account for all of Helfferich's limitations.

### Review of the Medical and Other Evidence

Because Helfferich contends that the ALJ's findings are not supported by substantial record evidence, the Court reviews the evidence regarding the two conditions he claims are disabling.

A. <u>Background/Chronology of Complications from Leg Fracture</u>

On September 29, 2004, Helfferich took a fall off the porch of his home in Clovis, New Mexico and broke his right leg in two places. He sustained a spiral fracture of the right distal tibia and a comminuted fracture of the proximal fibula. [Tr. 230-243, 362-384]. Helfferich testified at the ALJ hearing that the accident occurred when he was "coming down the porch" carrying something, when his wife called to him and he turned to talk to her. When he turned back, he stepped sideways off the porch and landed on his right leg, breaking the right tibia at the bottom. When he tried to get up, he says, he broke the top of his right fibula. [Tr. 526-527].

Helfferich was first seen at Roosevelt General Hospital in Portales, where x-rays revealed a nondisplaced proximal fibula fracture and a minimally displaced distal tibia fracture. He was placed in a long leg ortho-glass splint and told he should see an orthopedic specialist in Clovis, Roswell, or Lubbock, Texas. [Tr. 230-243]. His wife then drove him to University Medical Center in Lubbock. He was admitted to the hospital on September 29, 2004 with the expectation that surgery would be performed in the morning, with placement of an intramedullary rod. [Tr. 364-376, 380-383].

A closed reduction operation was performed by a resident physician on September 30, 2004,

and a long leg cast was applied. [Tr. 377-379]. There is no indication that any open surgery was performed, and it does not appear that a rod was inserted. Helfferich was discharged on October 1, 2004 with instructions to advance to "touchdown weightbearing" on his right leg and to follow up in 7-10 days. [Tr. 362-363].

On October 12, 2004, Helfferich was seen by Clovis orthopedist Dr. Jacob George. He told Dr. George that he felt motion at the fracture site and was experiencing continued discomfort. [Tr. 235]. Dr. George examined the x-rays taken in Lubbock and noted that the overall position and alignment of the tibial fracture was satisfactory. He also mentioned the fibula fracture. Dr. George concluded: "My recommendation at this time considering the cost factors and so forth is to let him continue in the present cast, since it is in a good state of repair. He should stay in this and on crutches non-weight bearing for a period of about six weeks or so." [Tr. 235].

Helfferich returned to see Dr. George on December 15, 2004. The doctor reviewed new x-rays taken on December 13 and noted that the fracture position remained unchanged, and there was no evidence of callus formation (which would indicate the beginnings of the healing process).[11] [Tr. 237]. The radiology report for the December 13 x-ray showed the tibial fracture displaced "not quite 1 cm," and the fibular fracture well aligned in position, but without any callus formation. [Tr. 432].

At the December 15, 2004 visit, Dr. George told Helfferich that his continued tobacco use could cause a delayed union or a frank non-union of the fracture. He stated that he would advise "intervention down the road with bone grafting, fixation, electrical stimulation, and so forth," and told Helfferich that it was up to him whether or not to have surgery. The alternative to surgery

---

[11]Callus: "an unorganized meshwork of woven bone . . . which is formed following fracture of a bone and is normally ultimately replaced by hard adult bone; called also bony callus." Dorland's Illustrated Medical Dictionary 277 (31st ed. 2007).

would be for Helfferich to continue in the leg cast for a few more weeks, then go into a removable brace so that he would be able to exercise the musculature and mobilize his ankle joint. [Tr. 237].

At Helfferich's next visit to Dr. George on January 6, 2005, the doctor noted that "he's really not making any progress whatsoever." Dr. George removed the cast and elected to keep it off at that time, so that Helfferich could gradually work on range of motion exercises for the knee and ankle. Helfferich told the doctor that he wanted to go ahead with surgery, and they decided on open reduction and internal fixation surgery with placement of an intramedullary nail. The doctor noted this would be done as soon as feasible. [Tr. 238].

There are no further records of any visits to Dr. George, and the planned surgery was never performed. On February 8, 2005, Dr. George wrote a letter (with no addressee noted), stating that Helfferich was tentatively scheduled for surgery on the tibia in January 2005, but "[d]ue to extenuating circumstances, finances, etc., this was not done." He stated further that Helfferich was under conservative treatment at that point with an equalizer boot on the right leg, on non-weight bearing crutches and would remain so "until such time as he shows healing or can have surgery." [Tr. 229].

Later that month, Helfferich began seeing Dr. Marcelo Filizzola at the La Casa Family Health Center in Clovis. He came into the clinic on February 23, 2005, complaining of continued pain in his right leg, adding that his right foot turned purple at times. [Tr. 402]. An x-ray taken that date showed "considerable disuse osteoporosis of the ankle," mild disuse osteoporosis of the tibia, and "just a little" callus formation at the tibial fracture site. The radiologist further noted there had been no change in alignment or position since the previous x-rays taken on December 13, 2004 and stated there is probably no fibrous union yet. [Tr. 431]. It is unclear what treatment was given at this visit.

7

An ultrasound taken of Helfferich's right leg on March 4, 2005 indicated that all arteries seen were normal. [Tr. 430].

Helfferich saw Dr. Filizzola again on April 20, 2005.  At that visit, he told the doctor he sometimes felt a sharp pain in his right leg.  No particular treatment was given at that time, although the record notes Helfferich was to follow up with an orthopedist in Albuquerque "next week."  [Tr. 400-401].  There is no record that Helfferich saw a doctor in Albuquerque in April 2005.  On May 4, 2005, he returned to see Dr. Filizzola.  At that time, the doctor discussed with Helfferich the surgical treatment proposed earlier, apparently referring to the December 2004 - January 2005 visits to Dr. George.  Helfferich told Dr. Filizzola that he was unable to afford surgical treatment.  A referral to University of New Mexico Hospital ("UNMH") in Albuquerque was noted, scheduled for August. [Tr. 403-404].

There is no record that Helfferich followed through with the plan for treatment at UNMH. A request to UNMH by the New Mexico Disability Determination Services office for Helfferich's medical records generated the response that Helfferich made no visits to UNMH between September 2003 and January 2006.  [Tr. 385-386].

In describing recent medical treatment on a form submitted in connection with his application for DIB and SSI, Helfferich stated in October 2005 that Dr. Harmston "said my leg [is] not fixable, and no other doctor will touch me." [Tr. 83].[12]  In reporting on a face-to-face interview in connection with Helfferich's DIB/SSI application, the interviewer noted that Helfferich had no difficulty in concentrating or sitting, among other things, but that he did exhibit difficulty in standing and walking.  The interviewer commented that Helfferich limped and used a cane when walking.

---

[12]The administrative record does not include reports of any visits to Dr. Harmston, prior to the clinic note dated November 8, 2006, described below.

[Tr. 109-111].

In a Disability Report filled out on November 14, 2005, Helfferich stated that he could not walk or drive. [Tr. 112-113]. However, in a Function Report filled out on December 25, 2005, Helfferich said he was able to walk (that is, "hobble"), although he needed the help of a cane. He also said that he drove himself to the store to do grocery shopping. He further stated that he could do household repairs, as long as he doesn't have to lift anything weighing over 25 pounds, and that while the condition of his leg affected his ability to lift, squat, stand, walk, kneel and climb stairs, it did not affect his ability to bend, reach, or sit. Although the cane was not prescribed by a doctor, Helfferich said he used it because his leg was weak and painful to walk on. [Tr. 147-153].

On February 13, 2006, an x-ray of Helfferich's right leg showed that the tibia and fibula fractures "have completely healed with solid union." The fibular fracture showed perfect alignment, and the tibial fracture showed "just slight medial displacement about 5 mm," with "significant solid union." The radiologist saw no change in alignment and position since the February 23, 2005 x-ray. [Tr. 307].

On February 20, 2006, Helfferich was seen by Dr. N. Alexander, a specialist in pain medicine, at Adobe Medical – Physical Medicine and Rehabilitation, in Roswell. Dr. Alexander noted that Helfferich was given a walking cast at UNM, which was in place for about six weeks, before Helfferich removed it himself.[13] At the time of this visit, Helfferich was not in a cast at all but used a cane in his right hand and walked with an antalgic gait, favoring the right leg ("antalgic"

---

[13]The statement that Helfferich had a walking cast applied at UNM appears to be inaccurate since, as noted above, UNM Hospital has no record that Helfferich was seen there between September 2003 and January 2006.

9

means a gait assumed so as to lessen pain).[14]  The doctor also noted that the range of motion in Helfferich's right ankle was decreased due to pain inhibition.  He wrote that the patient had "fallen through the crack" with a fracture that is probably not well healed and "symptoms consistent with a complex regional sympathetic pain syndrome."  No plan of treatment was given. [Tr. 308-309].  There is no record of any further visits to Dr. Alexander.  [*See*, Tr. 342].

On May 4, 2006, Helfferich was notified that his claim for Social Security disability benefits was denied. [Tr. 48-51].  He filed a request for reconsideration. [Tr. 128].

The next mention of Helfferich's leg in the record comes in a note by Dr. Filizzola on July 13, 2006.  He noted that Helfferich complained of chronic pain in the right leg due to the fractures, 6 on a scale of 0-10.  However, the doctor also noted that Helfferich appeared to be in no acute distress and that his balance, gait and stance were normal. [Tr. 278-279].  At an August 25, 2006 visit with Dr. Filizzola, Helfferich complained of pain in his right leg, 7 on the 0-10 scale.  However, again his balance, gait and stance were noted to be normal. [Tr. 275-276].  A similar pattern was seen at a visit with Dr. Filizzola on September 26, 2006; at that time, Helfferich complained of pain in his right leg, 6 on the 0-10 scale, but his balance, gait and stance were normal.  [Tr. 272-273].

On September 14, 2006, Helfferich's request for reconsideration was denied.  [Tr. 441-443].

Helfferich was examined at a clinic on November 8, 2006, apparently by physician's assistant Kristin McCool.  Ms. McCool signed the notes of the visit "for John Harmston, M.D.," and she states throughout that she consulted with Dr. Harmston.  It is not clear whether Dr. Harmston himself examined Helfferich.  There is no indication of Ms. McCool's or Dr. Harmston's medical specialty.

---

[14]Dorland's Illustrated Medical Dictionary 98 (31st ed. 2007).

On that date, Helfferich presented at the clinic, stating he was there for evaluation of his leg injury and wanted to explore possible surgical intervention to alleviate some of the pain in his leg pain. There is no indication that any particular treatment was given or recommended at this visit. Ms. McCool wrote in her clinic notes, "We do not feel that this gentleman can work at any full type of duty as he has significant pain just standing and walking. He could, however, perform some light-duty work or restrictive work that does not require much standing." [Tr. 157-158].

On November 27, 2006, Helfferich visited the emergency room in Clovis for problems with a wisdom tooth extraction and was noted, in passing, to be limping and walking with a cane. [Tr. 318].

Toward the end of 2006, Helfferich began seeing Dr. Dhirendra Lamba regularly at La Casa Family Health Center as his primary care physician. Dr. Lamba treated Helfferich primarily for his Hepatitis C condition. At a visit on October 12, 2006, Helfferich was treated for Hepatitis C, and he also complained of an aggravated rash on his trunk and palm. The only musculoskeletal symptoms noted by Dr. Lamba at that visit were arthralgias, *i.e.*, joint pain, with no particular joint specified. However, Helfferich's pain level at that visit was noted to be zero. [Tr. 267-268].

At a visit on December 28, 2006 Dr. Lamba noted in passing, as part of his physical findings, that Helfferich had no complaints of pain and that his balance, gait and stance were normal. [Tr. 261-262]. On January 23, 2007, Helfferich saw Dr. Lamba with complaints of an infected tooth and a swelling in the armpit area. The doctor noted a pain level of 5 on the 0-10 scale, due to "gland under arm pit." No complaints of leg pain were noted, and Helfferich's balance, gait and stance were normal. [Tr. 258-259].

When Helfferich visited Dr. Lamba on March 21, 2007 for other complaints, the doctor again wrote that his balance, gait and stance were normal; however, he noted that Helfferich complained

11

of pain at level 8 (on 0-10 scale), related to "leg and stomach." [Tr. 199-201].  On March 29, 2007, Helfferich was noted to be without pain and his balance, gait and stance were normal. [Tr. 197-198]. On April 10, 2007, Dr. Lamba noted that no musculoskeletal symptoms were present and that balance, gait and stance were normal. [Tr. 202-204].  At a visit on May 3, 2007, Dr. Lamba noted that Helfferich exhibited no musculoskeletal symptoms but complained of pain in the right lower leg and that an orthopedic consult would be done. [Tr. 205-207].

An x-ray taken on May 16, 2007 showed a "well healed, well aligned distal tibia fracture and a proximal fibula fracture also healed." [Tr. 209].  There is no further treatment noted in the record for Helfferich's leg complaints until October 2007 (see below).

At a visit on June 14, 2007, Helfferich's leg pain was not mentioned.  Dr. Lamba says he discussed with Helfferich the importance of "regular exercise." There is no indication that the exercise should be restricted in terms of lifting, weight bearing, or in any other manner.  [Tr. 211-212].  The same notation about regular exercise was made at visits on June 28, 2007 and August 10, 2007.  Helfferich reported no pain symptoms at either of those visits.  [Tr. 213-215].  At a visit on September 10, 2007, Dr. Lamba noted "chronic pain in right leg" as part of Helfferich's Past Medical History; however, Helfferich reported no pain at that visit.  Again, the doctor recommended regular exercise. [Tr. 222-224].  On September 27, 2007, Helfferich reported pain in his right ankle, 6 on a scale of 0-10.  Helfferich's chief complaint at that visit was not his leg, however, but a tooth abscess.  Dr. Lamba again recommended regular exercise. [Tr. 225-227].

On October 4, 2007, Helfferich was seen by Dr. Ryan K. Bergeson in consultation with Dr. Thomas DeCoster. [Tr. 477-478].  The visit was recorded in Clinic Notes which list Dr. Bergeson as a House Officer in the Department of Orthopaedics, and Dr. DeCoster as a Professor of Orthopaedics and Chief of the Division of Orthopaedic Trauma and Fracture.  The institution where

the doctors work is not given; however, it appears to be the University of New Mexico Hospital.[15]

In recounting the history of his leg fracture, Helfferich stated that he was initially treated nonoperatively in Lubbock and wore a cast for four months.  He says he then came out of the cast and continued to have a nonunion of the tibial fracture.  An outside orthopedic surgeon (presumably Dr. George, see above) offered surgical intervention, but Helfferich was unable to follow through with this due to lack of medical insurance.  Helfferich said that he was then seen "here in this clinic" (again, presumably UNMH) where he was placed in a short leg cast that led to healing of the tibia fracture.  Helfferich said further that he continued to have pain in the distal right tibia with ambulation.  He used a cane to keep the weight off his right leg. [Tr. 477].

Apparently Helfferich had a CT scan performed a week prior to this visit.  Dr. Bergeson reviewed the CT and wrote that it showed a central area of nonunion, which was surrounded by osseous union "with what appears to be excellent healing."  He also noted some "translation" or "transition" (the handwriting is unclear) at the site of the fracture, "but no unacceptable angulation" from any angle. [Id.].

Dr. Bergeson discussed the case with Dr. DeCoster.  Dr. DeCoster recommended against any operative intervention as Helfferich showed no surgically correctable conditions, such as angular deformity or significant shortening, as the cause of the pain.  The doctors recommended that Helfferich continue to ambulate with progressive weight bearing and weaning from the cane.  Helfferich expressed a desire for a second opinion, and an appointment was made with a Dr. Gehlert for a repeat evaluation in two months' time. [Tr. 477-478].  There is no documentation in the record

---

[15]Dr. DeCoster currently works as Chief of the Division of Trauma in Orthopaedics and Rehabilitation at UNMH, http://hsc.unm.edu/SOM/ortho/FacultyBio/TDeCoster.shtml; and Dr. Bergeson did his orthopaedic residency at UNMH, http://www.bergesonspine.com/.

of a visit with Dr. Gehlert.

After the October 4, 2007 consultation with Drs. Bergeson and DeCoster, Helfferich continued to be seen by Dr. Lamba who followed Helfferich for his Hepatitis C treatment. At a visit on October 18, 2007, Helfferich reported no pain symptoms and Dr. Lamba continued to recommend regular exercise. [Tr. 474-476]. At a visit on November 1, 2007, Helfferich again reported no pain symptoms, and Dr. Lamba noted Helfferich exhibited no musculoskeletal symptoms and his balance, gait and stance were normal. [Tr. 470-472].

On November 27, 2007, Helfferich visited Dr. Lamba complaining primarily of cold symptoms and chest pain. The doctor noted his pain level at 6 on the 0-10 scale, and wrote next to this "legs." Helfferich's balance, gait and stance were again noted to be normal. No particular treatment was recommended for the leg, although a prescription for painkillers was renewed. [Tr. 465-467]. Helfferich next saw Dr. Lamba on December 21, 2007. No mention was made of Helfferich's leg at this visit, and his pain level was reported to be zero. [Tr. 460-462].

Between December 13, 2007 and January 28, 2008, Helfferich was seen at Clovis Cardiology Associates on referral from Dr. Lamba for evaluation of the complaints of chest pain. [Tr. 496-514]. He was examined by Dr. Mahamadu A. Fuseini, who found tachycardia (rapid heartbeat) and prescribed Cardizem (a medication used to treat high blood pressure and angina[16]). Dr. Fuseini was not focusing on Helfferich's leg problems, but he did note as part of the physical examination that Helfferich showed no gait abnormality. [Tr. 497].

On January 28, 2008, Helfferich visited Dr. Lamba for a follow-up on his Hepatitis C treatment. At this visit, Dr. Lamba noted that, although Helfferich stated he was having pain in his

_____

[16]Physician's Desk Reference 1309 (53d ed. 1999).

right leg at a level of 7 on the 0-10 scale, he appeared to be in no pain but rather was "sitting comfortably laughing, making jokes, informing how well he is doing in life, bought new house won prizes, etc." [Tr. 459].

On April 22, 2008, Helfferich visited Dr. Lamba for problems unrelated to his leg. No mention of the leg was made on this visit. Dr. Lamba again recommended regular exercise, with no stated limitations. [Tr. 492-494].

On May 1, 2008, Helfferich's wife, Patricia Helfferich, submitted a statement in support of her husband's application for disability benefits. She stated that in the past Helfferich engaged in active outdoor activities, but the fracture combined with the Hepatitis C condition now limits his activities. She said his right leg did not heal correctly following the fracture and is now ½ inch shorter than the left, causing him to limp and experience extreme lower back pain. She said further that his leg sometimes locks up in pain, and that even taking a short walk leaves him irritable and fatigued and he hurts for days afterward. He has trouble sleeping because of the leg and foot pain, and sleep medication makes him groggy the next morning. He cannot sit or stand for more than 15 minutes at a time, and she does not think he can be retrained for other work because of the pain. She has also noticed short term memory loss. [Tr. 453-454].

At a visit to Dr. Lamba on May 9, 2008, Helfferich complained of pain in his right arm. He told the doctor he had been painting his house. The notes of this visit made no mention of the leg, and regular exercise was again recommended. [Tr. 488-490]. On July 17, 2008, Helfferich visited Dr. Lamba again. At this visit, he said he was still suffering from pain in his right leg due to the old fracture. Dr. Lamba prescribed pain medications and referred him to a pain clinic (although there is nothing on the record to indicate that Helfferich was treated at a pain clinic after July 17, 2008). [Tr. 487; *see also,* Tr. 484]. Dr. Lamba also noted at this visit that Helfferich appeared to be

15

depressed, so he prescribed Paxil. [Tr. 451, 484].

No further medical records appear regarding Helfferich's leg problems.

B.  Background/Chronology of Complications from Treatment for Hepatitis C

As far as the administrative record shows, Helfferich first became aware that he was infected with the Hepatitis C virus ("HCV") in 1997.  He was seen by Dr. Salman Khan in February 1997, complaining of pain beneath his ribs, loss of appetite, fatigue and night sweats.  The doctor ordered a number of laboratory tests and, at a visit on February 18, 1997, told Helfferich that he tested positive for the HCV antibody. [Tr. 239-243, 251].

Dr. Khan noted that Helfferich would be sent to a Dr. Block for a liver biopsy and that he would be started on interferon (antiviral) therapy if possible. [Tr. 242].  However, there is no documentation of any visit to a Dr. Block, other than a mostly-illegible handwritten note by Dr. Khan dated April 30, 1997 which refers to Dr. Block and appears to mention liver function tests and ultrasounds. [Tr. 243].  There is no indication in the record that a liver biopsy was performed at that time, and no record that Helfferich was treated with any medication for his HCV condition until many years later.

When Helfferich broke his leg in September 2004, the doctor assisting him at the hospital in Lubbock, Texas had him seen by an internal medicine consultant to determine whether surgery could be done, in light of the HCV condition.  The consultant, whose name appears to be Dr. Buscari, noted that Helfferich said he had no symptoms from the HCV and had never been treated for it. [Tr. 375].  Helfferich was cleared for surgery and, as noted above, underwent a closed reduction and had a long leg cast applied. [Tr. 377].

The next mention of HCV occurs in Helfferich's medical records on April 20, 2005.  On that date, he visited Dr. Marcelo Filizzola at a clinic in Clovis, complaining of continued pain in his right

16

leg and a persistent rash.  Dr. Filizzola noted Helfferich's HCV condition and wrote that he needed medication for it.  He ordered laboratory tests.  [Tr. 400-401].  When Helfferich returned for a follow-up visit on May 4, 2005, Dr. Filizzola noted that Helfferich would be sent for a GI referral to Roswell for hepatitis treatment. [Tr. 403-404].

Helfferich was seen by Dr. Shams Tabrez in Roswell at the Digestive Disease Institute on May 4, 2005. [Tr. 390-392].  Helfferich reported that he knew for many years that he had HCV and that he felt "fatigued and tired." [Tr. 391].  Dr. Tabrez ordered genotype testing and other laboratory tests and strongly recommended that Helfferich abstain from alcohol for 3-6 months in order to be ready for the HCV treatment.  The doctor stated that he would discuss options for HCV treatment after the genotype testing was completed, in about 3-4 weeks. [Tr. 392].  There is no record of any further visits to Dr. Tabrez.

When Helfferich applied for disability benefits in October 2005, he wrote that "Dr. Lamba says my condition is fragile, I could become deathly ill by just a simple virus, because my immune system is severely compromised." [Tr. 83].  There is no documentation in the record to support this statement.  Dr. Lamba made several mentions of neutropenia between February and November 2007; however, there is nothing to indicate that Helfferich's immune system was "severely compromised" either in 2007 or at any time prior to the October 2005 statement.[17]

In a Function Report which Helfferich filled out on December 24, 2005, he said that the HCV condition affected his memory and concentration, and that he was tired all the time.  In the same report, however, Helfferich also said that his attention span was fine, that he could finish

---

[17]"Neutropenia" is a decrease in the number of neutrophils in the blood, often leading to increased susceptibility to bacterial and fungal infections; "drug induced neutropenia" may be caused by prescription medication.  The Merck Manual of Diagnosis and Therapy 931-32 (17th ed. 1999).

chores and conversations, and that he had no trouble following written and spoken instructions. [Tr. 151-152].

On April 18, 2006, Helfferich was seen by CFNP Johanna C. Cullen at the La Casa Family Health Center, apparently in Clovis.  She noted that Helfferich had a history of HCV which had never been treated and wrote that she would like to get Helfferich signed up for the clinic's HCV program with Dr. Filizzola or Dr. Lamba. [Tr. 284-285].  Helfferich saw Dr. Filizzola on April 24, 2006 regarding the HCV, but other conditions were treated first. [Tr.  281-283].

Several doctor visits later, after various delays, Helfferich began treatment with interferon on October 5, 2006. [Tr. 269-271, 272-280, 287-294].  Common side effects of interferon treatment include flu-like symptoms such as fever, headache, fatigue, anorexia, nausea or vomiting.[18] Helfferich  appears to have suffered some of these side effects.  He saw Dr. Lamba on October 12, 2006 and reported feeling generally poorly, feverish, and with a headache, joint pain, nausea and diarrhea but no vomiting.  Dr. Lamba continued him on the HCV medication and ordered Tylenol for the headache, along with plenty of water and rest. [Tr. 267-268].

At a follow-up visit on November 3, 2006, Helfferich reported that he was doing fine although he had moderate headaches, joint pain and some diarrhea.  He was not experiencing nausea or vomiting, and his appetite was normal.  He reported a pain level of 6 on a scale of 0-10, all over his body.  [Tr. 264-266].  On December 28, 2006, he told Dr. Lamba he was feeling tired and poorly; however, the doctor apparently felt he was tolerating the HCV treatment well enough that the medication was continued. [Tr. 261-263].

Laboratory tests dated January 19, 2007 showed a negative HCV result. [Tr. 161].  At a visit

---

[18]Physicians Desk Reference 2855 (53rd ed. 1999).

18

to Dr. Lamba on January 23, 2007, Helfferich reported not feeling tired or poorly. [Tr. 188]. At a visit on February 7, 2007, Helfferich stated he was feeling fine, although he did complain of a headache. Dr. Lamba noted that Helfferich was still under treatment for HCV at that time, and wrote, for the first time, that Helfferich had mild neutropenia. Dr. Lamba recommended regular exercise. [Tr. 191-192].

On March 14, 2007, Helfferich told Dr. Lamba he had not been able to eat very well. He had an upset stomach, was suffering from acid reflux and night sweats, and he reported feeling tired and poorly. Dr. Lamba ordered lab tests and prescribed GI medication, and he continued Helfferich on the antiviral treatment. [Tr. 194-196]. On March 21, 2007, Helfferich reported he was still feeling poorly and was lethargic and easily tired. [Tr. 199-201]. About a week later, he said he was feeling fine and appeared healthy and in no distress. [Tr. 197-198].

At a visit on April 10, 2007, Helfferich stated he felt weak and had body aches and a runny nose. He seems to have had a cold and was given Sudafed and an oral antibiotic. [Tr. 202-204]. On May 3, 2007, Helfferich reported feeling tired or poorly. Dr. Lamba included "drug induced neutropenia" in his assessment. [Tr. 205-207]. On June 14, 2007, Helfferich said he felt fine and did not feel his current medications were causing any problems. He was again urged to do regular exercise and take multivitamins. [Tr. 210-212]. Helfferich again reported feeling fine at visits on June 28 and August 10, 2007. At the August 10 visit, Dr. Lamba again noted drug induced neutropenia. At both of these visits, Dr. Lamba recommended regular exercise. [Tr. 213-215, 216-218].

At a visit on September 10, 2007, Dr. Lamba noted that Helfferich reported "feeling fine," but with weakness and dizziness. The doctor again made note of drug induced neutropenia. [Tr. 222-224]. At a visit on September 27, 2007, Helfferich again reported "feeling fine," but with pain

in a possibly abscessed tooth.  Dr. Lamba ordered that he remain on the HCV treatment. [Tr. 225-227].  On October 18, 2007, Helfferich  visited Dr. Lamba with complaints of a headache, but otherwise feeling fine.  Dr. Lamba again ordered that he continue with the HCV treatment. [Tr. 474-476].  On November 1, 2007, Dr. Lamba again recorded headaches but noted that Helfferich did not feel tired or poorly.  The HCV medication was continued, along with prescription-strength Tylenol for a headache which Dr. Lamba noted may be secondary to the interferon treatment.  [Tr. 470-472].

At a visit to Dr. Lamba on November 27, 2007, Helfferich  reported that he had a cold and was feeling tired or poorly, but with no fever or chills.  The doctor again noted drug induced neutropenia.  [Tr. 465-467]. In a November 28, 2007 letter, Dr. Lamba stated that Helfferich suffered severe headaches from the interferon treatment and was placed on Tylenol, which would be continued while the interferon treatment was ongoing. [Tr. 464].  On December 21, 2007, Helfferich reported feeling fine and had no symptoms other than a headache.  Dr. Lamba continued Helfferich on the interferon treatment, with Tylenol for the headache. [Tr. 460-462].

At a visit on January 28, 2008, Dr. Lamba noted that Helfferich was feeling fine, with no headache.  Helfferich did not feel that his current medications were causing problems.  Dr. Lamba noted that Helfferich had completed 15 months of interferon treatment and that he would test the viral load and consider discontinuing the treatment soon. [Tr. 457-459].  This was the visit where Dr. Lamba reported that Helfferich appeared to be in no pain and, indeed, was laughing, making jokes and saying how well he was doing in his life. [Tr. 459].

At some point between January 28 and April 22, 2008, the interferon treatment was terminated.  At a visit on April 22, 2008, Dr. Lamba noted that Helfferich  had recently completed the HCV treatment. [Tr. 494].  On July 17, 2008, Dr. Lamba noted that Helfferich  completed the HCV treatment, and it was successful. [Tr. 451].

As noted above, Helfferich's wife Patricia submitted a statement on May 1, 2008 in support of her husband's application, in which she said that the aftereffects of the leg injury, combined with the HCV condition, limited the activities Helfferich can do.  She also said that Hr suffers from short term memory loss, and she feels he could not be retrained to do any other work due to his chronic pain. [Tr. 453-454].

**Discussion**

A.  <u>In Assessing RFC, Did the ALJ Give Appropriate Weight to the Opinion of Plaintiff's Treating Physician?</u>

Helfferich's first claim of error is his contention that the ALJ inaccurately assessed his RFC in that he failed to give controlling weight to the opinion of Helfferich's treating physician.

The ALJ found that Helfferich suffered from severe impairments, including an area of non-union and pain resulting from his broken right leg and "residuals," including headaches and fatigue and possibly neutropenia, resulting from the interferon treatment. [Tr. 15-17].  As neither of Helfferich's impairments met or equaled the listings, the ALJ went on to make an RFC assessment.

The ALJ found that Helfferich has the RFC to perform light work, except that he can stand and walk for a total of at least two hours in an eight-hour work day. [Tr. 17-18].  "Light" work is defined in the Social Security regulations as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567 (b); 416.967(b).

Helfferich argues that, in finding that he was capable of performing light work, with the

21

restriction that he "can stand and walk for a total of at least two hours in an eight-hour workday" [Tr. 17], the ALJ erred by discounting the opinion of Helfferich's treating physician, Dr. Lamba. In particular, Helfferich points to the medical assessment forms [Tr. 332-335] prepared by Dr. Lamba on March 20, 2007 and argues that in making the RFC finding, the ALJ should either have given these assessments controlling weight or else should have supplied a "coherent narrative discussion" explaining why he discounted them. [Doc. 18, at 12-13].

In his[19] medical assessment of Helfferich's ability to do physical work-related activities, Dr. Lamba notes that it is fatigue, not pain, which interferes with Helfferich's ability to maintain physical effort for long periods without the need to slow down or rest. However, he lists both pain and fatigue as factors affecting Helfferich's ability to do non-physical work activities. [Tr. 333].

Dr. Lamba further notes that Helfferich has the ability to lift or carry less than 5 pounds, either occasionally or frequently; that Helfferich can stand and/or walk, with normal breaks, for a total of at least 2 hours in an 8-hour workday; that he can sit, with normal breaks, for a total of less than 4 hours in an 8-hour workday; and that his ability to do pushing and pulling, including operation of hand and feet controls, is limited in the lower extremities. He noted no limitations in Helfferich's ability to perform either gross or fine manipulation (handling and fingering), and no limitations in his ability to reach in all directions, including overhead. He stated that Helfferich is occasionally limited in his abilities to kneel and stoop, but he is not limited in his ability to crawl; his notation with respect to limitations on crouching is unclear. [Id.].

The assessment form for physical work-related activities filled out by Dr. Lamba includes

---

[19]At places in the record, references to Dr. Dhirendra Lamba are accompanied by a feminine pronoun. At the hearing, Helfferich stated that Dr. Lamba is a man [Tr. 522]; the Court therefore uses masculine pronouns when referring to Dr. Lamba.

instructions to the doctor to "[i]dentify the particular medical findings (*i.e.*, physical exam findings, x-ray findings, laboratory test results, history, symptoms, including pain and other subjective symptoms, etc.), which support your assessments of any limitations." Each separate section asks "What are the medical findings supporting this opinion?"  Dr. Lamba did not include any medical findings in response to these questions. [Id.].

In his Medical Assessment of Ability to do Work-related Activities (Non-Physical), Dr. Lamba states that Helfferich's pain is not severe, but rather is "moderate to mild."  He further notes that Helfferich suffers from sleep disturbances and fatigue, and that he has to rest or lie down at regular intervals because of his pain and/or fatigue. [Tr. 334].

Dr. Lamba notes moderate limitations in three areas: ability to maintain attention and concentration for extended periods, to perform activities within a schedule, and to maintain regular attendance and be punctual within ordinary tolerance.  "Moderate" is defined on the form as a limitation which seriously interferes with a person's ability to perform the designated activity on an regular 8 hour per day, 5 days per week schedule. [Id.].

Dr. Lamba lists slight limitations in four other areas: ability to maintain physical effort for long periods without decreasing activity or resting intermittently, to sustain an ordinary routine without special supervision, to work in coordination or proximity to others without being distracted, and to make simple work-related decisions.  "Slight" is defined as meaning no significant limitation. Dr. Lamba makes no assessment of Helfferich's ability to "[c]omplete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods." [Id.].  It is unclear whether he intended to report no limitation in this area, or simply overlooked this part of the form.

Dr. Lamba was Helfferich's treating physician for a number of years.  Social Security

regulations require the ALJ to "[g]enerally . . . give more weight to opinions from [the claimant's] treating sources."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The ALJ may give controlling weight to the treating doctor's opinion on the issues of the nature and severity of the impairments, if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Id..

The ALJ is not bound to give the opinion controlling weight, however.  If he does not, he is directed to "give good reasons" in his decision for the lesser weight he assigns to the treating source's opinion.  Id.; Social Security Ruling ("SSR") 96-2p.  "Further, the notice of determination or decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  Watkins v. Barnhart, 350 F.3d 1297, (10th Cir. 2003).

> An ALJ should keep in mind that "[i]t is error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record."

Id., citing SSR 96-2p; 20 C.F.R. § 404.1527(d)(2).

If the ALJ determines that a treating source opinion should not be accorded controlling weight, that does not mean the opinion should be rejected; it is still entitled to deference and must be weighed using the factors set forth in the regulations at 20 C.F.R. §§ 404.1527 and 416.927.  Those factors include: whether the source actually examined the claimant; whether the source treated the claimant; the length, nature and extent of the treatment relationship; the extent to which the medical source presents relevant evidence to support his opinion; how consistent the opinion is with the record as a whole; whether the medical source is a specialist; and other factors.

This scheme contemplates that the ALJ will weigh the treating source's opinion against all

of the record evidence to determine whether the opinion should be accepted as conclusive.  In this case, the ALJ did just that, and he adequately explained his reasons for rejecting some of Dr. Lamba's conclusions.

As noted above, the ALJ found that Helfferich is capable of light work, with certain restrictions on standing and walking.  In making this finding, the ALJ necessarily rejected some of Dr. Lamba's findings as reported in his medical assessments.  The ALJ noted in particular Dr. Lamba's finding that Helfferich is limited to lifting less than five pounds at a time, due to fatigue. He explained his reasons for rejecting this limitation, noting that Dr. Lamba rendered his opinion while Helfferich was undergoing treatment for HCV and was reporting significant side effects from that treatment, including fatigue.  The ALJ noted further that Helfferich had since completed the treatment, and fatigue "is not the issue it was in March 2007," when Dr. Lamba rendered his opinion.

Helfferich argues that the ALJ's minimization of Dr. Lamba's medical opinion is speculative and is based on the ALJ's imposing his own non-medical opinion that Helfferich could not have been suffering interferon-related fatigue after March 2007.  He cites Kemp v. Bowen, 816 F.2d 1469, 1476 (10th Cir. 1987), which holds that an ALJ "cannot interpose his own 'medical expertise' over that of a physician."

The Commissioner argues that the ALJ's explanation can be seen as speculative only if one ignores Dr. Lamba's express rationale for his opinion and his medical findings.  To be specific, Dr. Lamba indicated that the restrictions he found were caused by fatigue.  While there are many reports of fatigue from Helfferich between March and May 2007, a time when he was being treated with interferon, his medical reports after May 2007, with a few exceptions, indicate that Helfferich was feeling fine without any weakness.  After the treatment was concluded, Dr. Lamba reported in July

2008 that it had been successful. The Commissioner notes further that a May 2008 medical report indicates that Helfferich painted his house. Thus, the Commissioner concludes, it does not require speculation to determine that the evidence supports the ALJ's findings.

Even if the comments about fatigue no longer being an issue were speculative, the ALJ also concluded that the lifting restrictions assessed by Dr. Lamba in March 2007 are inconsistent with the record as a whole and with the doctor's own treatment notes. [Tr. 19]. There is no error in an ALJ's examining the record and determining whether it supports a treating physician's opinion; that is what he is supposed to do. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ's conclusion in this regard is well supported by the record.

Dr. Lamba's treatment notes are extensive, and they contain no indication that Helfferich is restricted to lifting a maximum 5 pounds at a time. There are frequent notes regarding Helfferich's complaints of fatigue during his visits to Dr. Lamba, especially during the interferon treatment period; however, at several visits between February 2007 and May 2008, Dr. Lamba consistently recommended that Helfferich get regular exercise, with no restrictions mentioned. *See,* Tr. 192, 211, 214, 217, 223, 226, 475, 493, 489.

If the ALJ accepted Dr. Lamba's opinion, and that of consultant Dr. Ali M. Ghaffari who stated that Helfferich could lift only 10 pounds occasionally and 5 pounds frequently [Tr. 456], Helfferich would be precluded from doing light work. However, their opinions conflict with what Helfferich himself said. In a Function Report filled out in December 2005, Helfferich stated that he could do household repairs, as long as he didn't have to stand and lift anything weighing over 25 pounds. [Tr. 149].

Further, in an RFC assessment prepared by medical consultant Dr. N.D. Nickerson on May 2, 2006, lifting restrictions were given as 20 pounds occasionally, and 10 pounds frequently. [Tr.

348].  These restrictions would put Helfferich in the category of light work, in terms of his lifting capacity.  Notwithstanding the "greater weight" to be accorded the treating physician's opinion, the ALJ could reasonably have concluded that Helfferich's own statement that he was capable of performing household chores, so long as they did not involve standing and lifting over 25 pounds, should be accorded the greatest weight of all.  The ALJ took Helfferich's statement about household chores into consideration in making his RFC assessment.  [Tr. 18].

Helfferich argues in his Motion that the ALJ "overlooked the fact that in addition to his interferon treatment Mr. Helfferich was still suffering chronic pain due to his right lower leg fracture." [Doc. 18, at 8].  This statement is inaccurate; the ALJ discussed the leg condition and its effect on the RFC finding, noting radiographic studies showing that Helfferich's right leg fracture had solid union and "excellent healing." [Tr. 19].  The record supports this finding.  Helfferich's fractures apparently took an unusually long time to begin callus formation.  However, by February 13, 2006, an x-ray showed that the fractures had "completely healed with solid union," that the fibular fracture was in "perfect alignment," and the tibial fracture showed "just slight medical displacement" but with "significant solid union." [Tr. 307].  An x-ray taken on May 16, 2007 showed a "well healed, well aligned distal tibial fracture," and a healed fibula fracture. [Tr. 209].  A CT scan taken in late September or early October 2007 showed a central area of nonunion which was surrounded by osseous union and "what appears to be excellent healing." [Tr. 477].

The ALJ also pointed out the numerous instances in which Dr. Lamba noted that Helfferich's gait and stance were normal.  *See*, Tr. 198, 200, 203, 259, 262, 273, 276, 279, 571, 466.  Dr. Fuseini also  noted "no gait abnormality" in December 2007. [Tr. 497].  There are some references in the record to an "antalgic gait," walking with a cane and limping; however, Helfferich acknowledges that he was not told by a doctor to use a cane, but rather took it upon himself to do so.  Indeed, he

was advised by Drs. Bergeson and DeCoster in October 2007 to "wean" himself from the cane. [Tr. 477].

Helfferich also argues that, if the ALJ thought that Dr. Lamba's opinion was not supported by sufficient medical facts, he had a duty to contact Dr. Lamba and ask him "for clarification of his opinion before rejecting it," *citing* Robinson v. Barnhart, 366 F.3d 1078, 1084 (10th Cir. 2004).

In this case, the ALJ accepted a great deal of Dr. Lamba's opinion and incorporated it into his RFC finding, while also finding that there was nothing in the record to support the particular lifting restriction that Dr. Lamba noted. Thus, the ALJ was not completely rejecting Dr. Lamba's opinion. He had no absolute duty to recontact the doctor and seek clarification. While Robinson warns that the ALJ "is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability," Id., at 1083, that is not what the ALJ did in this case. He accepted Dr. Lamba's opinion to the extent it was supported by record evidence. He had no duty to accept those portions of the opinion that were not so supported.

The Tenth Circuit noted in Kemp v. Bowen, *supra*, that although the opinion of the treating physician is entitled to extra weight, the ultimate "resolution of genuine conflicts between the opinion of the treating physician, with its extra weight, and any substantial evidence to the contrary remains the responsibility of the fact-finder." Id., at 1476. In this case, the ALJ adequately explained his reasons for rejecting some of Dr. Lamba's conclusions. The Court finds no error in the ALJ's handling of the RFC assessment or his treatment of the treating source's opinion.

B.  Did the Hypothetical Posed to the VE Include All of Claimant's Limitations?

Helfferich's second argument is that the ALJ erred by posing a faulty hypothetical, which did not include all of his limitations, to the VE at the administrative hearing. Helfferich contends that, in the hypothetical posed to the VE, the ALJ should have included all of the limitations

assessed by Dr. Lamba, including the lifting restrictions which the ALJ rejected as unsupported by the record.

As discussed above in subsection A, the Court found that the ALJ acted properly in his handling of Dr. Lamba's opinion evidence.  The hypothetical posed to the VE at the hearing incorporated the ALJ's assessment of Helfferich's RFC, including all restrictions he found to be supported by the evidence.  The ALJ was not required to include in his hypothetical all limitations mentioned in the record, even those included in a treating source's opinion, if those limitations are not supported by the evidence and have been properly discounted.  *See*, Gay v. Sullivan, 986 F2d 1136, 1341 (10th Cir. 1993):

> We have already affirmed the ALJ's findings regarding the limited nature and effect of plaintiff's impairments. Because these findings are adequately reflected in the ALJ's hypothetical inquiries to the vocational expert, . . . the expert's testimony provided a proper basis for adverse determination of this case.

The Court finds no grounds for reversal in the ALJ's handling of the hypothetical posed to the VE.

## Recommended Disposition

That Plaintiff's Motion to Reverse or Remand [Doc. 17] be denied and this action be dismissed with prejudice.

_Lorenzo F. Garcia_

Lorenzo F. Garcia
United States Magistrate Judge

29